EDMISTON HOMES, LTD.

V.

THE MCKINNEY GROUP, ET AL.

Record No. 900896

March 1, 1991

Present: All the Justices

*George H. McNeal, III*, for appellant.
*Robert C. Bode (Bode and Dickinson*, on brief), for appellees.

JUSTICE RUSSELL delivered the opinion of the Court.

This appeal presents the question whether the language of subdivision restrictive covenants had the effect of creating a permanent easement.

In 1979, William J. Schmidt, doing business as S & S Development Company (Schmidt), submitted an application for the rezoning of a 50-acre tract in Henrico County to permit development for single-family, semi-detached dwellings. The rezoning was granted. The pertinent part of the Henrico zoning ordinance defined semi-detached dwellings as "[t]wo single family dwellings with separate entrances and situated on adjacent lots, each dwelling separated from the other by a party wall or exterior wall having a zero setback from the common lot line."

In November 1980, Schmidt applied to the Planning Department for approval of a "Plan of Development" (POD) covering 16.26 acres of the 50-acre tract, to be known as "Copperas Creek - Section I." This plan showed 62 lots platted for semi-detached dwellings. As required by the ordinance, Schmidt executed a declaration of restrictive covenants affecting the lots. These covenants were recorded on August 17, 1981, and were referred to on the

face of the recorded subdivision plat. The POD showed proposed semi-detached dwellings on lots 1, 2, 3, and 4 arranged so that the houses on lots 1 and 2 would be joined by a party wall, and those on lots 3 and 4 would be similarly joined, as shown below.

Prior to 1985, Schmidt built houses on lots 3 and 4, as proposed. Lot 3, with improvements, was conveyed to Patricia Parker. Lots 1 and 2 remained undeveloped. In 1985, Schmidt conveyed the unsold lots in Copperas Creek, Section I, including lots 1 and 2, to George J. McKinney, Roy B. Amason, and Max H. Goodloe, doing business as The Ashley Glen Group (Ashley). Ashley applied for a rezoning and modification of the POD to permit both "semi-detached" and "zero setback" detached dwellings. The latter are single family dwellings which must abut one lot line, leaving no side yard, but do not abut another dwelling. The rezoning was granted and the revised POD was approved.

The revised POD permitted zero setback detached dwellings on lots 1 and 2, but Ashley did not build on them. The County's planning director informed Ashley, before approving the revised POD, that a permanent easement, eight feet wide, must be provided on each lot adjoining a zero-setback detached dwelling for maintenance access to the zero-setback dwelling's wall along the property line. A diagram appears on the 1985 revised POD of a "typical lot layout" showing such easements, but no such easements were platted on the individual lots or mentioned in any conveyances. The sketch below indicates the requirements of the 1985 revised POD.

8′ easements required for maintenance

Ashley was, of course, unable to provide an easement over lot 3 because lot 3 had been conveyed to Patricia Parker. Ashley attempted, unsuccessfully, to purchase such an easement from her.

In 1986, Ashley conveyed lot 2 to The McKinney Group (McKinney), which consisted primarily of the principals in Ashley. By mesne conveyances, lot 2, still undeveloped, was conveyed to Edmiston Homes, Ltd. (Edmiston). Edmiston paid $20,000 for the lot and received title on June 10, 1988. Notwithstanding the lack of a recorded easement on lot 3 for the benefit of lot 2, the County issued a building permit for lot 2 and Edmiston commenced construction of a zero setback dwelling as permitted by the 1985 POD.

A few days after closing, Edmiston received a letter from an attorney representing Patricia Parker, the owner of lot 3, stating: "This is to advise you that you do not have her permission to encroach onto her property or to trespass upon her property in the construction of the dwelling on Lot 2." Edmiston suspended construction and informed McKinney.

McKinney made further unsuccessful efforts to purchase an easement from Parker* and, in April 1989, Edmiston brought this

---

* After this suit was filed, McKinney acquired an easement, 4 feet wide, rather than 8 feet wide as required by the POD, from Parker's successor in title, Joanne L. Allen. This easement was for the construction and maintenance of the dwelling on lot 2 and was recorded. The easement was subject to a $99,200 deed of trust on lot 3.

action, alleging breach of contract and fraud on McKinney's part. Edmiston contended that the lack of the required easement rendered the lot worthless for building and resale, and that McKinney had been fully aware of the lack of the easement at the time of settlement, having frequently attempted in the past to acquire it from Patricia Parker, but that McKinney had concealed that knowledge, assuring Edmiston that all the County's requirements had been met.

At a jury trial in February 1990, McKinney introduced in evidence the original restrictive covenants covering Copperas Creek, Section I, recorded by Schmidt in 1981. They provide, in pertinent part:

> Each Owner is hereby declared to have an easement and the same is hereby granted by the Declarant over all adjoining parcels for the purpose of accomodating [sic] any encroachment due to engineering errors, errors in original construction, settlement or shifting of building, or any other cause. There shall be valid easements for the maintenance of said encroachment, settlement or shifting; *provided however*, that in no event shall a valid easement for encroachment be created in favor of an Owner or Owners if said encroachment occurred due to the willful or wanton misconduct of said Owner or Owners. In the event that a structure on any Lot is partially or totally destroyed, and then repaired or rebuilt, the Owners of each Lot agree that minor encroachment over adjoining Lots shall be permitted and that there shall be valid easements for the maintenance of said encroachment so long as they shall exist.

At the close of Edmiston's evidence, and again at the close of all the evidence, McKinney moved to strike on the ground that the above-quoted covenant provided the necessary easement and that Edmiston, accordingly, had suffered no damage. The court recognized that the covenant provided easements only to accommodate encroachments, but expressed the view that it was impossible to erect a zero-setback building without encroaching on the abutting property to some extent, and that the covenant would thereupon come into play, providing the necessary easement. The court granted the motion and dismissed the action by final order entered April 20, 1990. We awarded Edmiston an appeal.

■ Edmiston first assigns error to the trial court's resolution of the factual issues as a matter of law, and also to the merits of the court's decision that the 1981 covenants provided an easement on lot 3 for the benefit of lot 2. We will disregard the first assignment. As noted above, at the close of all the evidence, counsel for McKinney renewed its motion to strike, contending that the 1981 covenants provided the necessary easements as a matter of law. Asked by the court for Edmiston's position, Edmiston's counsel responded, "Your Honor, we believe that this is a matter for the Court to decide on whether or not the restrictive covenants of 1981 on Copperas Creek grant the easement for construction or not." Thus, if the court erred in taking the factual issues from the jury, it was invited error and Edmiston may not complain of it. *Godsey* v. *Tucker*, 196 Va. 469, 476, 84 S.E.2d 435, 439 (1954).

Turning to the merits, we think the trial court decided the issue correctly. The zero lot line definition in the county ordinance prescribed a building touching the lot line on one side, and providing "zero yard on that side." The builder, therefore, had no option to avoid the lot line, even by a fraction of an inch.

The line itself, of course, may be portrayed on a plat by a mark having the width of the draftman's pencil point, but on the ground it is a purely abstract concept, having no physical width at all. A building which touches that line also touches the abutting property to the same extent. Although it might be theoretically possible to erect a wall which, when finished, would be exactly congruent with the line (a degree of perfection most unlikely), it is beyond human experience to imagine that such a perfectly oriented structure could be placed, exactly on the line, without some intrusion on the abutting property in order to erect and complete it.

■ The 1981 restrictive covenants provided easements to accommodate, and thereafter to maintain, encroachments resulting from construction errors "or any other cause." The record supports the court's conclusion that such an encroachment would inevitably occur.

■ It is true that the easements were unavailable in the case of an encroachment caused by "willful or wanton misconduct," but there is no evidence of misconduct of any kind on the builder's part. The court found that the easement would necessarily arise from any good-faith effort to comply with the county ordinance, which required a wall built precisely upon the lot line.

The easement provided by the 1981 covenant was not the eight-foot easement required by the County. The County waived that requirement, however, by the prompt issuance of a building permit for lot 2. Edmiston's complaint is not that construction was impeded by any failure of the lot to meet governmental requirements. Rather, Edmiston was impeded by the insistence of the abutting landowner that Edmiston had no right to "encroach" or "trespass" upon her property while erecting a zero lot line house on lot 2. Edmiston's cessation of construction upon receipt of this demand was then a tacit admission that it could not complete construction without some encroachment or entry upon lot 3.

■ Because the 1981 covenants were in her chain of title, the abutting landowner's position was unsound. Edmiston could have proceeded with construction despite her threat, or, if in doubt, could have pursued an appropriate legal remedy against her. The abutting landowner's assertion of an erroneous legal position did not equate to any fraud or breach of contract on McKinney's part.

Accordingly, the judgment will be

*Affirmed.*